Filed 11/30/23  In re Israel H. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ISRAEL H. et al., Persons Coming Under the Juvenile Court Law. | B328139 (Los Angeles County Super. Ct. No. 20CCJP02569) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. RUTH E., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Etan Z. Lorant, Temporary Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Appellant.

_____

Ruth E. (Mother) appeals from the juvenile court's order terminating her parental rights over eight-year-old Israel H., six-year-old Isaac H., four-year-old Ernesto H., almost three-year-old Noemi H., and 22-month-old Jacob H. under Welfare and Institutions Code section 366.26.[1]  Mother contends the court abused its discretion in failing to apply the beneficial parental relationship exception to the termination of parental rights.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Dependency Petitions*

On May 8, 2020 the Los Angeles County Department of Children and Family Services (Department) filed a dependency petition on behalf of Israel, Isaac, Ernesto, and Noemi alleging under section 300, subdivision (a) and former subdivision (b), that Juan H. (Father)[2] and Mother had a history of engaging in violent altercations in the presence of the children; on April 18, 2020 Father choked and pushed Mother; Father previously threatened to kill Mother; and Mother failed to protect the

_____

[1]    Further statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.

2

children from Father's abuse. At the May 13 detention hearing, the juvenile court[3] ordered the children released to Mother on the condition, among others, that Mother submit to random drug testing.

In February 2021 the Department learned Mother tested positive for methamphetamine in October 2020, November 2020, and February 2021. Mother also reported she was six months pregnant with a baby she was having with Father. On February 16, 2021 the juvenile court[4] issued a protective custody warrant removing the children from Mother.

On February 22 the Department filed an amended petition on behalf of Israel, Isaac, Ernesto, and Noemi adding allegations under section 300, former subdivision (b), that Mother had a history of substance abuse and was a current user of methamphetamine, which rendered her incapable of providing regular care to the children; and Father knew or should have known of Mother's substance abuse and failed to protect the children. On February 25, 2021 the juvenile court detained the children from Mother and granted her monitored visitation. The children were placed in the home of paternal aunt Marissa H. and her fiancé Rolando P.

---

[3]     Judge Sabina A. Helton.

[4]     Judge Jean M. Nelson issued the protective custody warrant and presided over the jurisdiction and disposition hearings and status review hearings.

At the July 12, 2021 jurisdiction and disposition hearing, the juvenile court sustained the amended petition,[5] declared Israel, Isaac, Ernesto, and Noemi dependents of the court, and removed them from Mother's and Father's custody. The court ordered Mother to submit to weekly random or on demand drug testing and complete a full drug program with aftercare for a minimum of six months. The court also ordered Mother to attend a domestic violence support group and individual counseling to address child safety, substance abuse, domestic violence, and codependency. The court granted Mother monitored visits for a minimum of two to three times per week for two to three hours each visit.

On August 26, 2021 the Department filed a dependency petition on behalf of Jacob (who was born in April 2021) under section 300, subdivision (a), former subdivision (b), and subdivision (j), based on substantially similar factual allegations to those in the sustained petition on behalf of the four older children. At the August 31, 2021 detention hearing, the juvenile court ordered Jacob detained from the parents, and on September 3 Jacob was placed in the home of paternal grandmother Estela H.

At the January 21, 2022 jurisdiction and disposition hearing on Jacob's petition, the juvenile court sustained the petition as alleged under section 300, former subdivision (b) and subdivision (j), declared Jacob a dependent of the court, and removed him from the parents' custody. Mother's case plan

---

[5]     The juvenile court struck from the amended petition the allegation Father should have known about Mother's drug use and failed to protect the children.

4

included an order to attend a full drug program upon any missed or positive tests. Mother was granted monitored visits with Jacob for a minimum of two to three times per week for two to three hours each visit.

B.   *Mother's Visitation During the Reunification Period*

The December 27, 2021 six-month status review report for Israel, Isaac, Ernesto, and Noemi stated the children continued to reside with Marissa and Rolando, where the children appeared to be thriving. Mother was having regular weekly monitored visits for three hours on Saturdays at a park and virtual visits on Wednesday evenings. According to one of the caregivers, Mother struggled to manage her time with the children, and the caregiver "constantly need[ed] to redirect [M]other to help ensure that all children are safe." The social worker observed Mother sitting with Noemi while the other children played with the caregivers and had to be prompted to interact with Mother. In addition, Mother would talk to Isaac and Israel alone and tell them to misbehave and "not to call the caregivers 'mom and dad.'"

Mother continued to have regular visitation (except during a two-month inpatient recovery program starting in March 2022). However, the caregivers observed that during the visits in the park, Mother was distracted on her cell phone as the children ran around. Mother was also distracted during virtual visits: sometimes she was driving, and at other times she seemed to engage with someone off-screen. The children also had difficulty sitting for 30 minutes during the virtual visits. As a result, the virtual visits were "mediocre."

In the July 1, 2022 six-month status report as to Jacob (then 14 months old), the Department reported he remained in

5

the home of Estela and was meeting his developmental milestones. The Department did not report on Mother's interactions with Jacob.[6] As of September 2022 Mother was having regular in-person visits with all five children in the park. The caregivers reported Mother had difficulty handling all of the children at once, and the two toddlers (Noemi and Jacob) tended to wander off and had to be retrieved by the caregivers. The caregivers assisted Mother in handling all the children at the same time. During an unannounced visit, the social worker observed Mother was "engaged with the children, playing at the park and sitting to eat with them," and the "children appear[ed] to have fun with their mother . . . ."

At the November 14, 2022 joint status review hearing, the juvenile court terminated reunification services for Mother as to all five children. The court found Mother's progress was not substantial, and although Mother participated in services, she continued to have contact with Father in a "co-dependent relationship[] focused on substance abuse." The court set a selection and implementation hearing (§ 366.26) for March 13, 2023.

C.    *Mother's Visitation After Termination of Family Reunification Services*

According to the February 23, 2023 section 366.26 report, Mother "maintained consistent and regular contact with the

---

[6]    The Department also reported that Mother tested positive for amphetamine and methamphetamine on March 17, 2022 after missing dozens of tests, although in April and May she tested negative.

6

children," visiting them weekly in the park or at a restaurant under the supervision of Estela, Marissa, and Rolando. Mother was able to engage the children through play and "to discuss school related events . . . in a healthy manner." Further, the children "expressed having fun with their mother" and "appeared to do well" during the visits.

Marissa and Rolando expressed interest in adopting the four older children, and they were able to provide for the children's needs. Israel felt safe and happy living with his caregivers and siblings. He wanted to remain in the caregivers' home and "only have visits with his parents at the park." The social worker observed that Israel referred to Marissa and Rolando as "Mom" and "Dad." Isaac likewise referred to the caregivers as "Mom" and "Dad," and he reported feeling safe and happy in his placement with his siblings and wanted to stay with them, although he also expressed that "he would like to go spend the night with his parents 'sometimes.'" Ernesto was emotionally attached to both caregivers and showed a "strong bond" with Ronaldo; he stated "he enjoys going to see his parents but wants to live in the house with his siblings and caregiver." Noemi appeared to have a strong, healthy attachment to the caregivers.

Jacob continued to live with Estela, who was providing him with a stable and nurturing environment. The social worker observed Jacob would run to Estela for comfort, support, and assistance. Jacob did well during visits with his parents, and he had "no issues transitioning back to his placement."

The Department recommended as the permanent plan adoption of the four older children by Marissa and Rolando, and Jacob by Estella.

In the March 9, 2023 last minute information for the court, the Department reported, "Although the parents are visiting with the children regularly, it appears the quality of the visits [is] mediocre." Eight-year-old Israel would interact with Mother for a short period of time, but he would spend the remainder of the visits with the caregivers while Mother was occupied with the other children. He would not follow Mother's directions, instead waiting for the caregiver's instruction, and Mother "struggle[d] with [asserting] her authority and boundaries" and instead appeared to create a "friendship-relationship." Sometimes Israel expressed that he did not want to go to the visits.

Six-year-old Isaac needed encouragement to engage with Mother during visits, and he looked to the caregivers for reassurance or comfort. At the end of visits Isaac did not have any difficulty leaving, and "instead [was] observed to be ready and willing to return to his placement." Four-year-old Ernesto appeared to have fun during visits interacting with Mother and playing with his siblings. But Mother had difficulty asserting her authority, and Ernesto would become disruptive and test Mother's boundaries, requiring the caregivers' intervention. At the end of visits, Ernesto did not appear to be in distress or to resist leaving.

Two-year-old Noemi played with Mother during visits, but she would often walk off, with the caregivers bringing her back, and Noemi looked to the caregivers first if she fell or needed help opening a snack. She was able to leave the visits without any issues. Likewise, 22-month-old Jacob would play with Mother at times, but he would also wander off. He often made sure Estela was still there, and he stood by Estela if he felt uncertain or uncomfortable.

The Department concluded the "children struggle [in] looking to the parents for comfort, assistance and direction" and, having been out of the parents' care for nearly three years at young ages, "it does not appear that the children have developed a substantial attachment to the parents." The Department asserted that terminating parental rights would be less likely to cause emotional instability because the children "have shown improvement and continue to thrive in their current placement[s]."

D.     *The Selection and Implementation Hearing*

At the March 13, 2023 section 366.26 hearing, the juvenile court[7] admitted the Department's reports into evidence, including the section 366.26 report, the last minute information for the court, and an unidentified status review report. No testimony or additional evidence was presented. The Department recommended the court terminate parental rights, and Father's counsel submitted. Mother's counsel opposed termination of parental rights, stating Mother "would be instead asking for legal guardianship." The attorney explained Mother had addressed her case issues: she was no longer in a relationship with Father, she had been sober for a year, she was attending meetings, and she had secured her own apartment. The attorney concluded, "While [Mother] doesn't have an issue with the paternal grandmother and the aunt being the caregivers of her children, Mother still believes that there is a bond worth saving between her and her children, and I think if we look throughout the

_____

[7]     Etan Lorant presided over the hearing as a Temporary Judge by the stipulation of the parties.

9

.26 report, Mother has been having consistent visitation, and by all accounts those visits go very well. So . . . there is enough here for Mother to be granted the legal guardianship." Mother's counsel did not specifically address the beneficial parental relationship exception.

Minors' counsel joined in the Department's recommendation to terminate Mother's parental rights, arguing that although "Mother's counsel brings up the parental bond exception," Mother failed to meet the three-prong analysis for application of the exception articulated by the Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*). Further, although Mother had consistent visitation, the Department's reports showed termination of Mother's relationship with the children would not be detrimental to the children. Minor's counsel also argued that given the children's young ages and that they had spent the last two years with their relative caregivers, adoption would provide the children with more stability, safety, and continued contact with their siblings than legal guardianship.

Following argument, the juvenile court found by clear and convincing evidence that all five children were adoptable and it would be detrimental to return them to the parents. The court terminated Mother's and Father's parental rights as to all five children. The court did not address the beneficial parental relationship exception or make any findings as to the *Caden C.* factors.[8]

---

[8] Although the juvenile court did not discuss any exception to termination of parental rights at the hearing, the minute order

10

Mother timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child."  (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *Caden C., supra*, 11 Cal.5th at p. 630.)  "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'"  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225 (*B.D.*); accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), the parent may avoid termination of parental rights if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child.  [Citations.]  The

states, "The Court finds that no exception to adoption appl[ies] in this case."  Given the lack of discussion of any exception to termination of parental rights at the hearing, we give no weight to the statement in the minute order.

11

language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.E.* (2023) 91 Cal.App.5th 683, 691.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.) When determining whether termination of parental rights would be detrimental to the child, courts need to consider "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633; accord, *In re D.P.* (2022) 76 Cal.App.5th 153, 164.)

"'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C., supra*, 11 Cal.5th at p. 633; accord, *In re Katherine J., supra*, 75 Cal.App.5th at

p. 317.)  "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion."  (*Caden C.*, at p. 630; accord, *In re I.E., supra*, 91 Cal.App.5th at p. 691.)

B.    *The Juvenile Court Did Not Abuse Its Discretion in Terminating Mother's Parental Rights*

Mother's sole contention on appeal is that the juvenile court erred in terminating her parental rights without addressing the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), and the *Caden C.* factors.  The Department counters that Mother forfeited the issue by failing to raise the exception at the section 366.26 hearing, and in any event, Mother failed to present evidence supporting the second and third *Caden C.* factors.  The court did not abuse its discretion.

A parent forfeits any exception to adoption not raised at the section 366.26 hearing.  (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292 [mother forfeited sibling relationship exception by failing to raise it in the juvenile court]; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403 [father forfeited sibling relationship exception by not raising it at the section 366.26 hearing].)  However, "application of the forfeiture rule is not automatic."  (*In re S.B., supra*, 32 Cal.4th at p. 1293; accord, *In re F.M.* (2023) 14 Cal.5th 701, 710 ["neither forfeiture nor application of the forfeiture rule is automatic"].)

Mother's attorney did not raise the beneficial parental relationship exception at the section 366.26 hearing, stating only

13

that "Mother believes there is a bond worth saving between her and her children" and Mother had consistent visits that "go very well." However, minors' counsel interpreted the argument by Mother's counsel as raising the exception, and minors' counsel addressed the *Caden C.* factors.[9] Because the exception was raised at the hearing, and in light of the significant consequences flowing from termination of parental rights, we exercise our discretion to consider Mother's argument on appeal that the beneficial parental relationship exception applies.

With respect to the second *Caden C.* factor,[10] Mother points to the Department's statement in the section 366.26 report that during her visits with the children, Mother engaged the children in play and discussed school-related events with them, the children "expressed having fun with their mother," and the children "appeared to do well" during the visits. Mother also points to her consistent visitation, arguing, "The frequent and consistent visits of Mother, throughout the life of the case, established that relationship had developed between the children and Mother that was strongly beneficial to them."

---

[9] Because minors' counsel addressed the *Caden C.* factors, we are troubled by the juvenile court's failure to make any findings on the beneficial parental relationship exception. Although specific findings are not required (see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156), the better practice would have been for the court to make findings as to each factor for the benefit of the parties and potential appellate review.

[10] The Department does not contend the first factor of regular visitation was not met.

Despite Mother's conclusory assertion her relationship with the children was "strongly beneficial," substantial evidence does not support an implied finding by a preponderance of the evidence of a "substantial, positive, emotional attachment" between Mother and the children. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Mother's visits with the children were generally positive, but the children's relationships with Mother were similar to those between a child and a friendly relative on a playdate. (See *In re Katherine J., supra*, 75 Cal.App.5th at p. 318, ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"]; *B.D., supra*, 66 Cal.App.5th at p. 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's [*sic*] interactions with the parent were not ambivalent, detached, or indifferent"].)

In the March 9, 2023 last minute information for the court, the Department reported Israel had a "friendship relationship" with Mother, but she struggled to assert authority, and Israel did not follow her directions, looking instead to Marissa and Ronaldo. Israel was sometimes reluctant to go to visits, and during visits he would interact with Mother for only a short period of time. Likewise, Isaac needed encouragement from the caregivers to engage with Mother, and he looked to his caregivers for comfort. At the conclusion of the visits, Isaac was "ready and willing to return to his placement." Ernesto, who developed a "strong bond" with Ronaldo, tested Mother's authority and would become disruptive during visits, requiring the caregivers' intervention. Noemi tended to wander off during visits and looked to the caregivers if she needed something. Jacob also wandered off and

15

sought assurance Estela was nearby.  Israel and Isaac referred to the caregivers as "Mom" and "Dad," and all three older boys stated they wished to live with the caregivers.  None of the children had any difficulty parting from Mother after visits.  Based on these observations, the Department described Mother's visits as "mediocre" and concluded, "[I]t does not appear that the children have developed a substantial attachment to the parents."  Mother identifies no contrary evidence that there was a substantial bond.

As to the third *Caden C.* factor, the record would support a finding the benefit and security provided by the children's placement with their relative caregivers outweighed any harm that would be caused by the loss of their relationships with Mother.  (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1158-1159 [affirming finding beneficial parental relationship exception did not apply where father regularly visited daughter and developed beneficial bond with her, but she viewed father as "'a fun, friendly person' to have visits with," not a parental figure].)  At the time of the section 366.26 hearing, the children had been living with their caregivers for two years, the majority of Noemi's and Jacob's lives.  As discussed, although the children had fun with Mother and enjoyed her visits, the children had a strong bond with the caregivers and did not show any sadness in leaving Mother at the end of visits.  Marissa and Ronaldo had been meeting the four older children's needs, and the children were happy and thriving in their home.  Jacob was likewise happy in Estela's care, and she was meeting his needs.

16

**DISPOSITION**

The juvenile court's order terminating Mother's parental rights is affirmed.

FEUER, J.

We concur:

SEGAL, Acting P. J.

MARTINEZ, J.